IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ALMA ROSE ROJO,

       Plaintiff,

     v.                              Case No. 02-CV-4112-JAR

IBP, INC.,

       Defendant.

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Alma Rose Rojo, plaintiff, by and through her attorney David O. Alegria of McCullough, Wareheim, LaBunker, P.A., and for her answer to Defendants' Motion for Summary Judgment shows to the Court the following:

## I. INTRODUCTION

Ms. Rojo worked for defendant from August 7, 1989, for almost eleven years, as a production worker making hamburger. Ms. Rojo worked the day shift. On or about March 23, 2000, Ms. Rojo injured her left hand working for defendant when she was pushing a gondola full of hamburger and her left hand got caught between the gondola and a safety post.

1

Ms. Rojo filed a workers' compensation claim on March 23, 2000. After that, she was placed in a job that was harder than her usual job.  Ms. Rojo continued to report substantial physical difficulties and repeatedly requested to be returned to her former position, but defendant refused to provide additional treatment or to accommodate her injury problems.

On June 17, 2000, Ms. Rojo went to defendant's human resources department about her treatment at work and requested additional and alternative medical care.  Following an evaluation on June 25, 2000, Ms. Rojo was given an impairment rating and returned to her regular job of making hamburger.

On July 14, 2000, Ms. Rojo was ordered by her supervisor to sign a warning about not doing her job correctly.  Ms. Rojo refused to sign and was sent to the office, where defendant fired her for not doing her job correctly.

Defendant was well aware of Ms. Rojo's worker's compensation claim. Defendant disciplined and fired Ms. Rojo for allegedly doing her job incorrectly within a period of one month after receiving an impairment rating as the result of her work-related injury.

## II.  Statement of Uncontroverted Facts

1.      Paragraph 1 is uncontroverted.

2.      Plaintiff objects to paragraphs 2 to 16 because it refers to events from 1989 to November 10, 1998, as old as 11 years and the most current,

20 months before July 14, 2000.  In addition, the evidence in this case demonstrates that Ms. Rojo did not have any valid or current disciplinary actions against her.  Bolton testified that in she did not have any work performance records.  He explained that on her current personnel record, there was no indication of personnel or work performance issues.  (Bolton depo. p 99 l. 2-17; Exhibit 2).

By way of proffer plaintiff further would be able to demonstrate at trial that under defendant's rules, disciplinary actions are on a one rolling year. After one year, disciplinary actions drop off and can no longer be considered for disciplinary action.  During the year that proceeded July 14, 2002, Ms. Rojo did not have any disciplinary action.  Ms. Rojo's employee action record of July 14, 2000, defendant's exhibits X and Y, IBP Documents No. 224 and 225, indicate that Ms. Rojo did not have any prior counseling, verbal warning, written warning, written warning and suspensions.  In addition, in a Memorandum written by the Human Resources director he indicates that she was a good employee in good standing with the company and on her current personnel records there were no indications of personnel or work related issues.  More specifically, he testified that she had been written up for deficiency in the way that she did her job.  (Doug Bolton Depo P. 98 L 22- Pg. 99 L 17)

3.     Paragraph 7 is also controverted in part.  Ms. Rojo testified that

her experience on the picking belt was about five months.  (Rojo Depo P. 91

Ls 1-17; Exhibit 1)

4.     Paragraph 17 is uncontroverted.

5.     Paragraph 18 is uncontroverted.

6.     Paragraph 22 is controverted.  First, the timing of the

assignment after her work injury is circumstantial evidence of retaliation.

Ms. Rojo testified as cited in paragraph 25 that the job was tougher, that

defendant wanted her out of there, her supervisor was standing there and

expecting her to get everything out of the belt.

7.     Plaintiff also objects to paragraphs 26 to 32 that refer to

plaintiff's vacation.  Plaintiff believes that such alleged facts are not material,

are not dispositive and are not even relevant to the elements of plaintiff's

claims.  The alleged facts may constitute argument of motive to the trier of

fact.  However, plaintiff believes that such alleged facts have no place in a

motion for summary judgment.

8.     Paragraph 33 is controverted.  Ms. Rojo testified that she did not

remember talking to Bolton about wanting to quit her job. ( P. 128)

9.     Paragraph 35 is controverted.  Ms. Rojo testified that her

supervisor showed her various different types of items that should have

been removed by other employees. (Defendant's paragraph 44)

10.     Paragraph 36 is controverted.  Ms. Rojo testified that in the tub

4

that Soto had there was lean meat, fat meat and bones.  (See defendant's paragraph 44).    Ms. Rojo indicated that she was doing the job as she was told to do it.  (IBP document 234.)

11.    Paragraph 38 is controverted.  Although Soto so testified, Ms. Rojo testified that the tub contained products that should have been removed by other employees.  (Defendant's paragraph 44) Ms. Rojo also indicated to the unemployment office that she was doing the job as she was told to do it.  (IBP document 234.)

12.    Paragraph 44 is uncontroverted.  Plaintiff believes that paragraph 44 also controverts defendants paragraphs 35 and 38.

13.    Paragraphs 45, 47, 49 and 98 are controverted.  Soto testified generically that Ms. Rojo said leave me the fuck alone maybe twice.   On July 14, 2000 according to Soto Ms. Rojo said that she was being a bitch to her. However, Soto admitted that she was trying to block whatever Ms. Rojo said, that she was difficult to understand and that she couldn't make out what Ms. Rojo was saying.  On the other hand, Ms. Rojo's version of the events do not indicate that there was any loud language, cursing or other problem.  (Rojo depo. P. 129 l. 14- p. 131).  More important Bolton admitted that in his almost two pages of notes abut the events of July 14, 2000, it does not say anywhere that Ms. Rojo was cursing.  (Bolton depo. P. 102)

14.    Paragraph 48 is incomplete.  Bolton testified that Ms. Rojo told

him that Soto was picking on her and harassing her.  Bolton depo.  P. 79 l. 6-9) Even without talking to Soto, Bolton was saying that Soto was not harassing Ms. Rojo.  (Bolton depo. P. 77 l. 14-80)

15.   The second sentence of Paragraph 50 is controverted for the reasons mentioned in response to paragraphs 45, 47 and 49 above.

16.   Paragraphs 52 and 54 are controverted as meaningless. Filling out a document concerning her 401K, turning in her badge and turning in her equipment  had no effect on Ms. Rojo's employment status. People turn in their equipment when they go on LOA and get it back and some people turn in their equipment for safety reasons.  Bolton's recollection is Ms. Rojo turned in her equipment and then he placed her on indefinite suspension.  (Bolton depo. P 166-167)

Ms. Rojo turning in her equipment would not have caused her to be terminated and would have not have caused her to have resigned.  In fact, none of the things that Ms. Rojo did on July 14, turning in her equipment, filling out paperwork would have had any effect on the status of her employment with the company.  (Bolton depo. P. 170-171)

17.   Paragraphs 60 and 61 are controverted.  Bolton specifically testified that on July 17, 2000, Ms. Rojo did not say anything about not wanting to continue working (Pg. 155 Ls 21-24).  In fact, Bolton admitted that on July 17, 2000 Ms. Rojo was asking to be allowed to return to work.

(Pg. 155 L. 6-156 L 9)

18.    Paragraph 65 demonstrates the decision-maker's knowledge of Mr. Rojo's protected activity.

19.    Paragraph 69 is incomplete.  Ms. Rojo also testified that during that same contact, she complained about being harassed at work.  (Rojo depo. P. 50 l. 6 - p. 51l. 3)

20.    Paragraph 77 is controverted.  Plaintiff believes that the cited testimony does not support defendant's contention.

21.    Paragraphs 79 and 80 are incomplete, Ms. Rojo testified that when she went to Bolton to complain, he didn't listen to her.  Nobody in personnel would listen.  She went to Doug a couple of times with problems and he wouldn't listen.   (Rojo depo. P. 107)

22.    Paragraph 84 is controverted.  Throughout her deposition, Ms. Rojo explained her harassment because of her injuries.  In fact, in paragraph 78 of defendant's motion, defendant cites Ms. Rojo's testimony that she was harassed because of her work injuries.

23.    Paragraph 89 is controverted. Ms. Rojo specifically testified that Soto mistreated injured employees that filed workers' compensation claims and did not mistreat non-injured employees. (Rojo depo. P. 18)

24.    Paragraphs 101 and 102 are controverted by Ms. Rojo's testimony about mistreatment after her work related injury.  In addition,

Ms. Rojo indicated to the unemployment office that she was doing the job as she was told to do it.  (IBP document 234.)

### III.  Arguments and Authorities

### A.  Burden of Proof

In *Ortega v. IBP, Inc.*, 255 Kan. 513, 874 P.2d 1188 (1994), the Kansas Supreme Court decided the applicable burden of proof in a retaliatory discharge case.  The Court stated:

> In Kansas, claimants are required to prove a claim for retaliatory discharge by clear and convincing evidence. Clear and convincing evidence is not a quantum of proof but rather a quality of proof. A party having the burden of proving a retaliatory discharge from employment for having filed a workers compensation claim must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature. It is clear if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it.  255 Kan. 513, Syl. ¶ 2.

The Ortega Court did not include in its definition of the burden of proof the language from fraud cases recited by defendant that:

> "the witness to a fact is found to be credible; the facts to which the witnesses testify [are] distinctly remembered; the details in connection with the transaction [are] narrated exactly and in order; the testimony [is] clear, direct and weighty; and the witnesses [are] lacking in confusion as to the facts at issue." Malek v. Martin Marietta Corp., 859 F. Supp. 458, 465 (D. Kan. 1994).

Therefore, plaintiff requests that in ruling on defendant's motion for summary judgment, the Court's analysis be based in light of the Supreme Court's language in Ortega.

Substantively, the test at the  summary judgment stage is:

> "whether the evidence, interpreted favorably to the plaintiff,
> could persuade a reasonable jury that the employer has
> discriminated against the plaintiff." *MacDonald v. Eastern
> Wyoming Mental Health Center*, 941 F.2d 1115 (10th Cir. 1991)
> (quoting *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570
> (7th Cir. 1989)).

## <u>APPLICABLE KANSAS LAW</u>

"An employee-at-will may not be discharged under any circumstances where the discharge violates or frustrates any clear public policy." Id. at Syl. 2 (emphasis added).  *Pilcher v. Board of Wyandotte County Commissioners*, 14 Kan.App.2d 206, Syl. 2, 787 P.2d 1204 (1990).

### B.  STATUTE OF LIMITATIONS DEFENSE

In this section, without citing any authority, defendant contends that any adverse employment action pre-dating July 12, 2000, two years prior to the filing of this case, is barred by the statute of limitation and can not be used by plaintiff in her claim.

In Rebarchek v. Farmers Co-op Elevator & Mercantile Ass'n, 28 Kan. App. 2d 104, 110-11, 13 P.3d 17 (2000), the Kansas Court of Appeals dealt with this issue.  In *Rebarchek*, the Court stated:

> Our Supreme Court has recognized that, in the context of
> discriminatory acts covered by the Kansas Acts Against
> Discrimination, K.S.A. 44-1001 *et seq.,* events predating the
> period of limitations may provide a basis for recovery because
> they were part of a continuing pattern of discrimination. Evidence

of such events also may be admissible to prove that the ultimate termination sued upon was motivated by unlawful discrimination. See *Woods*, 231 Kan. at 765.

The same analysis applies with equal force to a common-law action for retaliatory discharge for filing a workers compensation claim. Rebarchek has come forward with adequate evidence to proceed to trial on the theory that defendants' actions constituted a continuing pattern of discrimination, and the jury may further consider the evidence of events predating the limitations period for whatever weight it elects to afford it on the issue of discriminatory intent.

The language of the Kansas Supreme Court was even clearer. In an action for retaliatory discharge for filing a workers compensation claim, a plaintiff can avoid summary judgment by showing a pattern of retaliatory conduct beginning with the filing of a workers compensation claim to termination, notwithstanding such conduct predates the period of limitation for such action. Rebarchek v. Farmers Co-op Elevator & Mercantile Ass'n, 272 Kan. 546, 35 P.3d 892 (2001). Syl. ¶ 6.

This issue is important because defendant appears to be asking the Court to discount defendant's acts against Ms. Rojo from March to July 2000. However, plaintiff believes that defendant's argument is completely devoid of merit.

## C.   Whether the Termination Was Based on Retaliation

**1**.   Prima Facie

In this section, defendant claims that plaintiff can not make a prima facie showing of retaliatory discharge because she can not demonstrate that she was fired and can not establish a causal connection between her protected activity and her firing.

10

### a.    Termination

Substantively, defendant's first argument is that it did not fire Ms. Rojo on July 14, 2000.

First, plaintiff believes that the case law uses adverse employment and termination interchangeably.  As such, adverse employment action and discharge both would give rise to a viable claim against defendant.  Although Ms. Rojo's claim is for retaliatory discharge, plaintiff also submits that the evidence demonstrates that defendant fired Ms. Rojo.

Under the law, "[a]ctions such as suspensions or terminations are by their nature adverse, even if subsequently withdrawn." *Roberts v. Roadway Express, Inc.*, 149 F. 3d 1098, 1104 (10th Cir. 1998).  The Roberts Court stated that the 10th Circuits liberally defines the phrase "adverse employment action," *citing Anderson*, 181 F.3d at 1178.

Plaintiff believes that under the Robert's standard, even the disciplinary action by Ms. Rojo's supervisor, the written warning by Bolton and the suspension by Bolton all constitute adverse employment action.  In this regard, the Roberts' Court stated:

> As to the written warnings, Roadway contends that they had no adverse effect on the terms and conditions of *Roberts*'s employment because, after a nine month term of "validity," they could not be used to support disciplinary actions such as termination. But the record indicates that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction.

11

Even in defendant's section about the burden shifting analysis, defendant refers to the third element as "defendant took an adverse action against plaintiff." As such, plaintiff believes that when an employer like defendant has a progressive disciplinary system where warning can lead to termination, such warnings constitute adverse action. See *Roberts* citing *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997) ("There was also evidence that [employer] had 'papered' [plaintiff's] file with negative reports including two written reprimands. These are the kind of serious employment consequences that adversely affected or undermined [plaintiff's] position, even if he was not discharged, demoted or suspended."); Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996) (noting that pattern of retaliation began with plaintiff being "written up"); cf. Berry, 74 F.3d at 986 (holding that employer actions that "can have an adverse impact on future employment opportunities" are legitimately regarded as "adverse employment action[s]," and that in light of Title VII's remedial purposes, adverse employment action should not be defined narrowly).

In *White v. Tomasic*, 31 Kan. App. 2d 597, 600, 69 P.3d 208 (2003), the Kansas Court of Appeals indicated:

> Employers rarely admit to retaliatory intent, and plaintiffs must ordinarily rely on circumstantial evidence to prove a prima facie case of retaliatory discharge. *Marinhagen v. Boster, Inc.*, 17 Kan. App. 2d 532, 540, 840 P.2d 534 (1992), *rev. denied* 252 Kan. 1092 (1993). Proximity in time between the claim and discharge is a typical beginning point for proof of a causal connection. 17

> Kan. App. 2d at 540. Close temporal proximity between a
> workplace injury or the filing of a workers compensation claim
> and the **adverse employment action** may be "highly persuasive
> evidence of retaliation." *Gertsch v. Central Electropolishing Co.*,
> 29 Kan. App. 2d 405, 409, 26 P.3d 87, *rev. denied* 272 Kan. ____
> (2001).  Emphasis added here

Therefore, adverse employment action against Ms. Rojo, at a minimum, would be demonstrative of defendant's retaliatory conduct against her.  In addition, the same would be circumstantial evidence supporting Ms. Rojo's testimony that defendant fired her.

There is no dispute that Soto pulled Ms. Rojo off of the line to give her a counseling, that Bolton gave her a written warning and that Bolton suspended her indefinitely pending termination.

Ms. Rojo testified that on July 14, 2000, she wanted to go back to work.  However, Bolton, the HR manager told her that she could not go back to work and asked her to leave.  P, 146 l, 12 - 147 l. 17.  Ms. Rojo specifically testified that in firing her, Bolton told her that she was fired for not doing what she was supposed to be doing.  P. 146, l. 21-24.  Ms. Rojo knows she was terminated because she was told to leave on her own or they would call security.  (Rojo depo. P. 56)

In attacking plaintiff's prima facie showing defendant first claims that Ms. Rojo was not fired.

Contrary to defendant's assertion, the facts show that on July 14, 2000 Doug Bolton, Defendant's personnel director issued a written warning to Ms.

Rojo and suspended her indefinitely.  In the employee action record, next to the word discharge Bolton wrote the word "pending."

At the bottom of the employee action record, it indicates that Ms. Rojo is to return on the 15th of July 2000 if she wants to keep her job.   Ms. Rojo testified that she returned on the 15th but she was not allowed to work and was asked to leave.  (Rojo Depo. Pg. 146 L7 - Pg. 147 L 17 )

Ms. Rojo also testified that she was told to leave on her own or security would escort her out.  (Rojo Depo Pg. 55 L2 25- Pg. 56 L 4).

On July 14th Ms. Rojo testified that she asked to be allowed to go back to work and Bolton told her she could not go back to work and to go home. Bolton requested her ID and asked her to get out of there or he would bring security to throw her out.  (Rojo Depo. Pg. 132 Ls 10-12).  Ms. Rojo asked if she still had a job and Bolton said there was no job.  (Rojo Depo Pg. 133 Ls 1-4)

Therefore, although defendant might be technically correct that Ms. Rojo was not fired on July 14, 2000 the evidence is clear that she was suspended indefinitely on the 14th pending discharge.  When Ms. Rojo returned on July 15, 2000 she was informed that she did not have a job and was instructed to leave the premises.  Therefore, plaintiff believes the evidence demonstrates she was fired by defendant.

With respect to the 401K form, the request for medical records and

turning in the equipment, none of those acts would cause Ms. Rojo's employment to be terminated (Doug Bolton's Depo. Pg. 146 Ls 21-24).  Ms. Rojo testified that the reason she was given for her employment termination was that she was not doing what she was supposed to be doing.

IBP Document 221 dated July 17, 2000, in the middle, contains Doug Bolton's writing wherein it says "term ASAP."  Plaintiff believes that construing the evidence in the light most favorable to the plaintiff, Ms. Rojo's testimony and defendant's document are indicative of the fact that Ms. Rojo was fired by defendant

### b.    Causal connection

In this section, defendant claims that Ms. Rojo cannot present to the Court any evidence of a causal connection between her termination of employment and her work related injury.

Defendant's first claim is that Ms. Rojo admitted in her deposition that the only people who mistreated her because of her work-related injury were Patsy Soto and "Pam Castro."  Defendant goes on to argue that this admission is fatal to her claim that she was fired retaliatorily.

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quoting *Burrus v. United Tel. of Kans. Inc.*, 683 F.2d

339, 343 (10th Cir. 1982)). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." *O'Neal,* 237 F.3d at 1253.

"We have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." *O'Neal*, 237 F.3d at 1253 (quoting *Anderson*, 181 F.3d at 1179).

In Ms. Rojo's case, she was injured on March 23, 2000, was on light duty for one week and was on alternative duty until her last day of work. During April and May she worked on the trim belt.  Ms. Rojo testified that after her injury she was placed on the trim belt and stayed on the belt. (Rojo Depo Pg. 109 Ls 13-18).  Ms. Rojo was off work on a leave of absence for three weeks in June of 2000.  (Rojo Depo. Pg. 124 Ls 11-17).  She returned to work and on July 14, 2000 she was taken off her work and later fired.

Plaintiff believes that the timing of Ms. Rojo's termination of employment is sufficiently close in time to her injury, requests for medical treatment, requests to be allowed to do her regular work and as such, demonstrative of a causal connection between her work related injuries and the adverse employment action.  Ms. Rojo actually worked between two and one-half to maybe three months after her injury and before her termination.

16

Defendant's argument also omits that Doug Bolton was fully aware of Ms. Rojo's work related injury, her exercise of statutory rights under the Kansas Workers' Compensation claim and the fact that on the day of events that gave rise to Ms. Rojo's termination of employment, Mr. Rojo was in Bolton's office complaining about harassment by the supervisor.

Defendant claims that ten days after she was fired Ms. Rojo told her physician that she had been terminated because she was unable to do her work.  As the Court can see, Ms. Rojo's report to her physician that she was fired is at least consistent with her testimony that she was fired.  It is also consistent with defendant's documents that termination was pending and term asap.

In addition, plaintiff believes that what Ms. Rojo told her physician is consistent with what she testified she was told by Doug Bolton (Rojo Depo. Pg. 146 Ls 23-24) She was told that she was fired for not doing what she was supposed to be doing.   On Page 172 L7 Ms. Rojo clearly says, "they told me I was not doing what I was supposed to be doing."

IBP Document 234, although attached to an Affidavit of Dale Masters who claims the document is part of Ms. Rojo's file, plaintiff submits that this is inadmissable hearsay.  Even if the Court were to admit the document, Plaintiff believes that her statements to the unemployment office support her deposition testimony.  The document demonstrates that Ms. Rojo told the

unemployment office that ever since her injury she was constantly being switched to other jobs.  She never knew where she was going to be and that the supervisor was always telling her that she was not doing this or that right.  On the last incident Ms. Rojo explained that she was asked to sign a warning about not doing her job correctly.  Ms. Rojo indicated that she was doing the job as she was told to do.

Plaintiff believes that the information that Ms. Rojo provided to her doctor is definitely consistent with the fact that she was fired.  What she told the unemployment office is consistent with her claim of retaliation.

Defendant claims that the fact that Ms. Rojo did not complain that her thumb was causing her any difficulty undermines her claim.  Plaintiff is unable to see how the alleged lack of verbal complaints about the specific injury undermines her claim in light of Ms. Rojo's testimony of her mistreatment by her supervisor.

Most importantly a document produced by defendant IPP 231 dated July 17, 2000 demonstrates that defendant was fully aware of the precarious condition of Ms. Rojo's injury.  (Attached hereto as exhibit 4)

Bolton admits in reviewing document 231 that he was the only Doug at the plant in management on July 17, 2000.  Shawn Dees was defendant's worker's compensation coordinator.  The document states:  "Both Shawn & Doug from the plant state this lady has a pretty bad looking thumb."

18

Therefore, the decision maker was a witness to the condition of Ms. Rojo's injury at about the time of her termination of employment.

Defendant also attempts to explain that Ms. Rojo was placed in the trim belt because she had a lot of experience on the trim belt.  A close reading of Ms. Rojo's testimony reveals that she testified that she had less experience on the trim belts than other people working the trim belts.  Ms. Rojo testified that during her employment she might have worked for five months on the belt.  (Rojo Depo P. 91 Ls 1-17)

Ms. Rojo testified that she thought she had been assigned to the belt because she thought they wanted her to suffer because they knew that the job was tougher than the other jobs.  (Rojo Depo Pg. 97 Ls 8-24)  Ms. Rojo testified that she thought the defendant wanted her to get tired of the job and that her supervisor would assign her to work and was standing right there.  (Rojo Depo Pg. 98 Ls 1-11)

Ms. Rojo went on to explain that one person cannot do the job and sometimes they had to put three or four people on the line.  However, when a bone went through the machine, the line had to be stopped and the employee would be written up.  (Rojo Depo Pg. 98 Ls 13-25)

Clearly, Ms. Rojo felt that defendant placed her to work on the trim belt to set her up to be fired.  It is also important that defendant has not advanced any reasons for putting Ms. Rojo to work on the trim belt or why

she was placed on a more difficult job than her bid job.  This is particularly important because of Mr. Rojo's injuries.

Defendant also claims that because Ms. Rojo could not identify any derogatory statements, it is entitled to summary judgement.  However, Ms. Rojo testified that she was mistreated when she was going to the doctor. (Rojo Depo. Pg. 6 Ls 15-16).  Ms. Rojo explained that after her injury she was assigned to a job harder than her regular job. (Rojo Depo. Pg. 9 Ls 7-21).  She testified that although there were three people on the belt she was always blamed for everything that happened on the line. (Rojo Depo. Pg. 9 Ls 23- Pg. 10 L 19). She testified that Patsy Soto was always on her back when she had injuries.  Ms. Rojo felt that Patsy Soto was going over to her line to harass her.  (Rojo Depo Pg. 15 Ls 15-22).

Ms. Rojo worked for defendant for almost 11 years and she knew Patsy Soto. She testified that Patsy Soto was against people who filed work comp claims or who got injured. (Rojo Depo. Pg. 17 Ls 18-21).  Ms. Rojo explained that Patsy Soto bothered the people who filed workers' compensation claims and did not bother the people who did not file work comp claims. (Rojo Depo. Pg. 17 L 25- Pg. 18 L 16).

Ms. Rojo testified about other employees with injuries who were fired. (Rojo Depo. Pg. 19 Ls 2-7; Pg. 20 Ls 4-25; Pg. 22 L 10- Pg. 23 L 5).  Ms. Rojo testified that Patsy Soto had in her head that people who filed workers'

compensation claims were costing the company money.  (Rojo Depo Pg. 39 L 11- 14)

When Ms. Rojo was released she reported that she was still having problems with her hand and called a hotline about her injury and the way she was being mistreated.  (Rojo Depo Pg. 50 Ls 9-21; Pg. 51 Ls 1-23).

Ms. Rojo testified that nobody in personnel would listen.  She specifically indicated she went to Bolton a couple of times with problems and he would not listen.  (Rojo Depo Pg. 107 Ls 10-19).

During her conversations with Patsy or Pam Ms. Rojo asked for medical treatment or to be allowed to see another doctor.  (Rojo Depo. Pg. 120 Ls 2-7)

Ms. Rojo also felt that defendant tries to get rid of injured employees. (Rojo Depo. Pg. 140 Ls 1-5).

As of July 17, 2000 Ms. Rojo was asking for medical treatment with another doctor.  (Rojo Depo. Pg. 153 Ls 8-13).

### D. Defendant's Articulated Reason

In this section, defendant claims that defendant has articulated non-retaliatory reasons for its action.  Specifically, defendant claims that Ms. Rojo was called to the office on July 14th because she did not perform her job correctly.  However, Ms. Rojo has testified that she had five months of experience on the job and that she was doing the job in the way she had

been instructed to do it.  Ms. Rojo's version of the meeting with Doug Bolton

and with her supervisor are also different than defendant's version of the

events.  Ms. Rojo testified that the only thing she did was refuse to sign a

write-up for which she did not agree and she was not allowed to return to

work,  was taken off work and the next day she was told she had no job.

### I.    Whether defendant's articulated reasons were pretextual.

In this section, defendant claims that Ms. Rojo cannot carry her

ultimate burden in the case by clear and convincing evidence.  Defendant

cites *Foster and Nguyen.*  However, in Foster Footnote 3, the court stated:

> AlliedSignal contends that the fourth, causal-connection element
> of a prima facie case must be established by "clear and convincing"
> evidence. (Appellee's Br. at 16.) Holding a plaintiff to such a standard
> at the prima facie stage would pervert the logic of the <u>McDonnell
> Douglas</u> burden-shifting scheme adopted by the Kansas courts. <u>See
> Rebarchek v. Farmers Coop. Elevator & Mercantile Assoc.</u>, 35 P.3d 892,
> 901 (Kan. 2001) ("A claimant's 'prima facie case is not an onerous
> burden under the <u>McDonnell Douglas</u> burden-shifting scheme'" (quoting
> <u>Robinson v. Wilson Concrete Co.</u>, 913 F. Supp. 1476, 1483 (D. Kan.
> 1996)).

In addition, in *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111,

1115 (10th Cir. 2001), the Court indicated that:

> the trier of fact may still consider the evidence establishing the
> plaintiff's prima facie case 'and inferences properly drawn
> therefrom on the issue of whether the defendant's explanation is
> pretextual

To show that an employer's proffered nondiscriminatory reason for an

employment action is pretextual, a plaintiff can produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 490 (10th Cir. 2006)

Defendant's proffered reason for the action taken against an employee in discrimination cases, must be reasonably specific and clear. *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992) (citations and footnote omitted). If the defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment if she is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual.

Plaintiff believes that the same analysis applies here.

Defendant claims that Ms. Rojo seized the opportunity of being counseled for poor job performance to request that she be fired.  Contrary to defendant's position, Ms. Rojo repeatedly testified that she did not ask to be fired.  (Rojo Depo. Pg. 156 L8-9; Pg 138 Ls 4-25; Pg. 135 Ls 25 - Pg. 136 L 5) and planned on coming back the next day.  Ms. Rojo also testified that she was instructed to leave and at one point she was threatened to be ejected by security.  Defendant claims that because Ms. Rojo received medical treatment

somehow that demonstrates lack of a pre-text.  Plaintiff does not see how defendant having to perform a legal obligation shows that in firing Ms. Rojo defendant then used the alleged poor work performance as a pre-text for retaliation.

### THE ALLEGED INSUBORDINATION OF JULY 14, 2000

With respect to defendant's action against Ms. Rojo, Bolton first testified that a superintendent, Jose Balderama had witnessed a verbal altercation that was occurring in the production area.  He asked Ms. Rojo to leave the production area and go to the personnel office.  ( Pg. 67 L 21 - Pg 68 L 1)  Bolton was specific that Balderama witnessed Ms. Rojo swearing and using curse words at the supervisor and that he asked her to go to the personnel office (Pg. 71 Ls 8-11)

Bolton also claims that Ms. Rojo told him that she was cursing the supervisor and she was being harassed by the supervisor (Pg. 70 L 5-7) According to Bolton, Ms. Rojo told him that she was at her work station and the supervisor came up and started harassing her and that she started swearing at the supervisor and Jose Balderama asked Ms. Rojo to go to the personnel office (Pg. 70 Ls 17-22)

When Bolton was presented with notes that he wrote, he changed his testimony to indicate that the alleged insubordinate acts witnessed by Balderama occurred in the production office. (Pg. 83 Ls 15-18)

Bolton testified that the insubordinate action was witnessed by Balderama in the production office.  He also claims that Ms. Rojo later became insubordinate in the personnel office.  (Pg. 89 L 22-Pg. 90 L 2)

Bolton testified that Balderama witnessed Ms. Rojo be allegedly insubordinate in the production office and in the personnel office. (Pg 90 Ls 3-8)

## JULY 17, 2000

In his deposition testimony, Bolton testified that he was one hundred percent certain that on July 17, 2000, Ms. Rojo did not ask to be fired. Bolton p. 147 l. 1-18.  In fact, Bolton testified that on July 17, 2000 as he recalled, she seemed pretty happy, pleasant and level headed.  Nothing like she was on July 14.  (Bolton depo. p. 148 10-23)

Bolton specifically testified that on July 17, 2000, Ms. Rojo did not say anything about not wanting to continue working (Pg. 155 Ls 21-24).  In fact, Bolton admitted that on July 17, 2000 Ms. Rojo was asking to be allowed to return to work.  (Pg. 155 L. 6-156 L 9)

Bolton also testified that he represented the defendant and believes that he testified in an employment hearing contesting Ms. Rojo's application for unemployment benefits (Pg. 151 L 5-12).

Bolton was asked to review the finding of the unemployment judge that

on July 17, Ms. Rojo continued to be upset and indicated that she wanted to be fired.  Bolton claimed that he did not recall telling the Judge that on July 17th Ms. Rojo was upset and demanded to be fired (pg. 151 Ls 21-24)  Bolton also  admitted that if he testified at Ms. Rojo's unemployment hearing that she was upset and demanding to be fired on July 17, as the decision indicated,  that would be the exact opposite of what he testified to during his deposition.  (Pg. 153 Ls 20-25)

## THE ALLEGED RESIGNATION

Bolton also testified even thought Ms. Rojo turned in her equipment and did not report to defendant on July 15, 2000, that he was 100 percent certain that he did not say that defendant had considered her to have quit or resigned. (P. 147 l. 1 to 178 l 9)

Bolton admitted that the unemployment decision indicates that because Ms Rojo had turned in her badge and her equipment on the 14th, the company had considered her to have separated her employment.  (Pg. 154 Ls 1-11)

Bolton also admitted that according to the unemployment decision Ms. Rojo had no prior history of work performance problems.   (Pg. 154 L 24- Pg. 155 L 5)

There is no explanation regarding the inconsistencies on what defendant claimed at Ms. Rojo's unemployment hearing and the current

story.  However, at a minimum, there are controverted issues of material fact as to defendant's articulated reasons for firing Ms. Rojo.

In this section defendant also faults plaintiff for her alleged recollection. Defendant elected to take this deposition without a translator fully knowing that Ms. Rojo had substantial limitations with the English language.  Plaintiff agrees that plaintiff's deposition is confusing, difficult to follow and perhaps at times even inconsistent as defendant claims.  Plaintiff submits that reading the deposition demonstrates substantial difficulties in communication during the deposition.  Ms. Rojo was clear about her injuries, problems with her injuries, her need for medical treatment, the fact that she was related to return to work and was having problems and she requested medical treatment on Monday, July 17, 2000, the Monday after the Friday when she was removed from the line.

Defendant claims that Ms. Rojo failed to provide facts or information that substantiated a link between the comments and her work injury.  This contradicts defendant's statement at Page 21 where defendant stated, "plaintiff admitted in her deposition that the only people who mistreated her because of her work related injury were Patsy Soto and "Pam Castro"." (Facts 78-80).  Therefore, plaintiff believes that even to defendant the causal link between Ms. Rojo's mistreatment and her exercise of statutory rights was clear.

## IV.  Conclusion

In Sanjuan v. IBP, Inc. , 275 F.3d 1290, 1294 (10th Cir. 2002), the 10th Circuit had occasion to deal with a retaliatory discharge case in which a jury found defendant liable twice and Judge Saffels assessed punitive damages to defendant.  In that case, the Court stated:

> As stated above, IBP is "the world's largest producer of beef, pork and related allied products." Sanjuan II, 78 F. Supp. 2d at 1198. Yet for all its success and correlative economic power, IBP has been party to an inordinate number of retaliatory discharge cases in this Circuit in recent years. See, e.g., Rodriguez v. IBP, Inc., 243 F.3d 1221 (10th Cir. 2001); Sanjuan I, 160 F.3d 1291; Rodriguez v. IBP, Inc., No. 96-3159, 1998 WL 426797 (10th Cir. July 20, 1998); Ramirez v. IBP, Inc., No. 97-3111, 1998 WL 257161 (10th Cir. May 21, 1998); Chaparro v. IBP, Inc., Nos. 95-3078, 95-3098, 1996 WL 733771 (10th Cir. Dec. 24, 1996); Velazquez v. IBP, Inc., No. 95-3239, 1996 WL 594280 (10th Cir. Oct. 17, 1996); Lawrence v. IBP, Inc., No. 95-3278, 1996 WL 508423 (10th Cir. Sept. 9, 1996); Tovar v. IBP, Inc., Nos. 94-3263, 94-3384, 1996 WL 282289 (10th Cir. May 29, 1996).

The 10th Circuit acknowledged that in granting punitive damages against defendant, Judge Saffels stated:

> Given IBP's history of policies which encourage retaliation against injured workers, a specific policy is necessary to make it clear that IBP does not tolerate such conduct. This is particularly true when supervisors have not been disciplined for retaliating against an injured worker. No one was disciplined for the decision to fire Sanjuan. Two juries found that IBP retaliated against Sanjuan, and one jury found that IBP's conduct was serious enough to warrant punitive damages. . . . At the punitive damage hearing, several IBP officials testified that they were not aware of any supervisors who were fired due to retaliation against injured workers.

Defendant has a long history of harassment and mistreatment of injured employees.  Its self insured status have acted, over the years, as a potent motive to fire injured employees.  Therefore, for the above and foregoing reasons, plaintiff respectfully requests that the Court deny defendant's motion for summary judgment and that this case be allowed to proceed to trial by jury.

MCCULLOUGH, WAREHEIM & LABUNKER, P.A.

By:   s/ David O. Alegria
       DAVID O. ALEGRIA, #13111
       P.O. Box 1453
       1507 Topeka Boulevard
       Topeka, Kansas 66601-1453
       (785) 233-2323
       ATTORNEYS FOR PLAINTIFF

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of October, 2006, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Tammy M. Somogye

10851 Mastin Blvd., Suite 1000

Overland Park, KS 66210

tsomogye@lathropgage.com

Robert W. McKinley

LATHROP & GAGE, L.C.

2345 Grand Blvd., Suite 2800

Kansas City, MO 64108-2684

rmckinley@lathropgage.com

_____   /s/ David O. Alegria_____

David O. Alegria, #13111

30