lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ALMA ROSE ROJO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 02-4112-JAR |
| | ) | |
| IBP, INC., | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Alma Rose Rojo instituted this action under Kansas law for wrongful discharge in retaliation for her filing a worker's compensation claim. Her former employer, IBP, Inc. ("IBP"), moved for summary judgment contending plaintiff's action was barred by a prior settlement agreement. This Court agreed with IBP, and granted the motion. The Tenth Circuit Court of Appeals reversed the Court's order and remanded for further proceedings.[1] This matter is presently before the Court on IBP's motion for summary judgment on plaintiff's worker's compensation retaliatory discharge claim (Doc. 82). For the reasons explained in detail below, the Court grants IBP's motion.

## I.      Uncontroverted Facts

At the outset, the Court notes that in response to defendant's motion for summary judgment, plaintiff has failed to comply with the local rules that govern the summary judgment process. D. Kan. Rule 56.1(b) provides in relevant part:

---

[1] *Rojo v. IBP, Inc.*, Case No. 03-3300, 2005 WL 2697253 (10th Cir. Oct. 21, 2005).

> (1) A memorandum in opposition to a motion for summary judgment shall begin with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists.  Each fact in dispute shall be numbered by paragraph, shall refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, shall state the number of movant's fact that is disputed.

> (2) If the party opposing summary judgment relies on any facts not contained in movant's memorandum, that party shall set forth each additional fact in a separately numbered paragraph, supported by references to the record  . . . [2]

The rule further states that "all material facts set forth in the statement of the movant *shall be deemed admitted* for the purpose of summary judgment unless specifically controverted by the statement of the opposing party."[3]  "The enforcement of this rule does not depend on the movant filing an objection or showing prejudice from the opposing party's non-compliance."[4]  Plaintiff's responses fail to meet the requirements of Rule 56.1.

Plaintiff does not specifically controvert most of defendant's material facts.  Nor has plaintiff presented any additional factual contentions in separately numbered paragraphs; instead, she intersperses her factual contentions throughout her purported response to defendant's statement of facts.  The Court will not sift through plaintiff's disjointed narrative in an attempt to identify controverted facts.  "The very purpose of Rule 56.1 is to avoid such a misdirection of judicial resources.  Moreover, such an approach would vitiate the explicit sanction contained within the rule—the requirement that the facts which are not admitted or denied will be deemed

---

[2]D. Kan. Rule 56.1(b).

[3]D. Kan. Rule 56.1(a).

[4]*Hartnett v. Parris*, 925 F. Supp. 1496, 1500 n.1 (D. Kan. 1996).

admitted."[5]  Accordingly, pursuant to Rule 56.1, many of the facts presented in defendant's

motion are deemed uncontroverted.

The following facts set forth in defendant's summary judgment memorandum and that

find support in the record, are uncontroverted:

Plaintiff began working for IBP on or about August 7, 1989.[6]  On July 24, 1997, plaintiff

was notified that her bid on a job called "rework reject chubs" was successful.  This job involved

handling damaged boxes and opening packages of chubs and throwing them into the extruder to

be reground.

Between July 24, 1997 and March 23, 2000, plaintiff sometimes worked on the picking

belt instead of in rework.  A picking belt is a conveyor belt that carries product to a storage or

holding bin that has meat and fat material on it.  For example, the 80/20 belt on which plaintiff

sometimes worked should have a product that is approximately 80 percent lean and 20 percent

fat and no bones.  Persons working on the 80/20 picking belt are required to inspect the product

coming on the conveyor belt and, depending on the assignment, remove the bone or foreign

objects, fat, or lean product that meets the criteria for the 93 percent lean hamburger that the

plant also produces, also called "lo-fat."

On March 23, 2000, plaintiff experienced a work-related injury to her left hand when she

was pushing a gondola full of hamburger and her hand was caught between the gondola and a

---

[5]*Joshua W. v. Bd. of Ed. of Wichita Pub. Sch. U.S.D. No. 259*, 13 F. Supp. 2d 1199, 1205 n.6 (D. Kan. 1998).

[6]Plaintiff objects to IBP's statement of facts that relate to events that occurred before July 14, 2000, the date of her alleged termination.  Plaintiff's objection does not controvert the facts offered and remain uncontroverted. Further, plaintiff's attempt to "proffer" facts about IBP's disciplinary rules is inappropriate for opposing a motion for summary judgment.  Plaintiff does not present these additional factual contentions in separately numbered paragraphs, instead interspersing them throughout her response to IBP's statement of facts.

safety post.  She requested and received medical treatment for this work-related injury.  Dr. Zeller imposed work restrictions for plaintiff from March 23, 2000 to March 30, 2000.  During this time, plaintiff was assigned to light duty in the laundry department.  Although plaintiff stated in her answers to IBP's interrogatories that she told the nurse, "Pam Castro," that she could not do the job assigned to her in the laundry department, plaintiff testified in her deposition that she did not have any problems doing the job in that department and that IBP complied with her restrictions while she was in the laundry department.  IBP did not employ a person by the name of "Pam Castro" when plaintiff worked there, but did employ nurses in the Health Services Department named Pam Moreno and Patricia Castro.

Dr. Zeller released plaintiff to work on March 30, 2000.  Plaintiff was placed in the processing department, under the supervision of Teresa Hall and Patsy Soto.  Plaintiff testified that she did not know or have a suspicion or belief about why she was assigned to do the picking job in the processing department, but later admitted that it was because the company was short people and she had experience doing that job.  Plaintiff also testified that sometimes her supervisor had to fill in for the job at the picking belt.

When asked whether her assignment to the picking belt had anything to do with her work-related injury, plaintiff testified that although she did not think it was fair, she did not know whether it had anything to do with her worker's compensation claim.  Plaintiff later testified that she thought "they just wanted me to suffer because they knew that the job was tougher than any of the other ones."  When asked why she had that belief, plaintiff responded, "[s]o I would get tired of it.  I think that's what they tried to get me out of there**.**"  When asked what happened to make her think that, plaintiff answered, "[b]ecause she, Patsy, was standing

right there and, . . . she knew that I didn't like it there.  That's why.  Because I told her that it was harder because she expected you to get everything out of that belt, everything."

In 1998 and 1999, plaintiff asked to take vacation at the same time as her husband, who also works for IBP.  Plaintiff was not eligible to take vacation because she had not yet reached her employment anniversary date and had no vacation time remaining.  Nevertheless, IBP allowed plaintiff to take an unpaid leave of absence to coincide with her husband's vacation.  In April 2000, plaintiff asked her supervisor to approve vacation time in June so that she could be off work at the same time as her husband.  Because other co-workers in plaintiff's department had previously received approval for time off during the same time period, plaintiff's request for vacation was denied.  For the pay period ending April 29, 2000, plaintiff requested and received three weeks' pay in lieu of vacation.

At her request, plaintiff was also granted a leave of absence from June 19 to July 10, 2000.  Doug Bolton, the Complex Personnel Manager for the plant, testified that he recalls a meeting with plaintiff during the week of July 10, 2000, wherein she stated to him that she was thinking about quitting because of personal issues at home.  Plaintiff testified that she did not remember saying this to Mr. Bolton.

On July 14, 2000, four days after her three-week leave of absence, plaintiff was working on the 80/20 belt.  On that date, Patsy Soto inspected the product coming off the 80/20 belt and found that much of the lo-fat (93%) material was going in, instead of being removed from that belt.  Ms. Soto pulled the 93% product out and put it in a tub.  She then observed plaintiff working on the picking belt, where she had been assigned the duty of picking the lo-fat product.  At one point in her deposition, plaintiff claims that she was the person on the belt who was

5

supposed to be removing the lo-fat product; at another point, she claims that she was supposed to be removing the fat product.  Ms. Soto testified that she observed that plaintiff was only removing 20 percent of the product that needed to be removed from the belt.  Plaintiff testified that the tub contained products that should have been removed by other employees.

Ms. Soto drafted an Employee Action Record in the production office, indicating that she was going to counsel plaintiff for letting the lo-fat product go by into the bin collecting the 80/20 mixture.  Counseling is the lowest form of discipline issued by IBP.  After preparing the Employee Action Record, Ms. Soto went to the production floor to ask plaintiff to come to the production office.  Ms. Soto testified that plaintiff had not complained to her about the condition of her thumb on the morning of July 14, 2000.  Plaintiff testified that when Ms. Soto approached her, she had a tub containing bone, fat and lean.  Plaintiff loudly cursed at Ms. Soto on the way to the production office.  Ms. Soto testified that plaintiff said that Ms. Soto was being a "bitch" to her.  Plaintiff denies any loud language or cursing; Mr. Bolton's report does not specifically indicate that plaintiff was cursing, but he testified that she did in fact curse.

After Ms. Soto took plaintiff to the production office, she called Gloria Rodriguez, a Superintendent in the processing department, to talk to plaintiff.  Ms. Rodriguez and Jose Balderrama, a foreman in the processing department, spoke with plaintiff in the production office.  Plaintiff's behavior in the production office was "inappropriate" and Mr. Balderrama took plaintiff to the personnel department to speak to Mr. Bolton.

Mr. Bolton testified that during this meeting with plaintiff, she said that Ms. Soto was picking on and harassing her by telling her to get the lean off of the picking belt.  Plaintiff was insubordinate when she was in Mr. Bolton's office.  Mr. Bolton testified that she was upset and

cursing, and told him that Ms. Soto was always picking on her, that she was not going back to

that job, and that he should "just fire her" so she could receive unemployment.  Mr. Bolton

declined to fire plaintiff and explained that he was simply asking her to do a better job of getting

the lean product out of the belt and into the proper place.  Mr. Bolton also counseled plaintiff

that if she quit, she would lose three weeks vacation that was to accrue August 8, 2000.  Plaintiff

indicated to Mr. Bolton that she had considered quitting due to personal problems with a child at

home and asked about her vacation.  Mr. Bolton advised that she must work through her

anniversary date.  When Mr. Bolton explained to plaintiff that her supervisor has the right to

discuss work performance issues with employees, plaintiff continued to assert that she was not

going back to that job and that he should fire her.  Mr. Bolton suspended plaintiff for the

remainder of the day on July 14, 2000, and encouraged to her to return to see him the next day

after she had given her decision serious consideration.  He testified that the suspension was

issued because of plaintiff's insubordination, threats, attitude and demeanor during his meeting

with her.  Mr. Bolton did not terminate plaintiff's employment on that date.

After plaintiff talked to Mr. Bolton, she requested information about how to get her

retirement benefits and filled out a form requesting such benefits.  After she filled out the

retirement benefit request, plaintiff went to the nurses' office to request a copy of her medical

records.  She then turned in her equipment.  July 14, 2000 was the last day plaintiff performed

work in IBP's plant.

Plaintiff testified that she returned to work on July 15, 2004, and asked Mr. Bolton if she

could return to work.  According to her testimony, Mr. Bolton told her he "didn't think so" and

told her "to leave."  Plaintiff testified that Mr. Bolton did not talk about her injury or her

worker's compensation claim during their July 15 meeting.  Bolton testified that he does not recall meeting with plaintiff on July 15, and has no record or notes of any such meeting.

Plaintiff returned to the plant on July 17, 2000, without any request from IBP that she do so.  Plaintiff talked with Mr. Bolton, who testified that he believed that plaintiff did not want to return to work, although she did not specifically say so.  Mr. Bolton testified that plaintiff said that she wanted to return to work so that she could get her vacation pay that would accrue on August 7, 2000.  Mr. Bolton offered to allow plaintiff to stay on the payroll until she earned her vacation pay and allow her to voluntarily terminate her employment at that time.  Mr. Bolton testified that he did not have any resignation notice from plaintiff on file.  Plaintiff filled out a Request for Vacation Form on July 17.  She was paid for this vacation that she requested.

A person must be an employee of IBP in order to request and receive payment for accrued vacation.  Mr. Bolton testified that plaintiff could have returned to work on August 8, 2000 because she was still employed by the company.  He also testified that the fact that plaintiff was receiving medical treatment or had a work-related injury did not have anything to do with how he treated her.  Ms. Soto testified that on approximately July 21, 2000, Mr. Bolton informed her that plaintiff was not going to be returning to work any shifts, but he had put off her "term" paperwork until after August so that she could get her vacation time.  Mr. Bolton asked Ms. Soto if she would have a problem if plaintiff returned to work and she said that she would not.  Ms. Soto testified that she was not happy that plaintiff was going to be gone.

On July 17, 2000, plaintiff requested a second opinion concerning the worker's compensation injury to her left hand.  On July 18, 2000, IBP granted plaintiff's request and scheduled an appointment with Dr. Baughman for plaintiff on July 25, 2000.  Plaintiff testified

8

that she believed she called someone from the company in Dakota City to complain about the medical treatment she received for her thumb as well as being harassed at work, but she could not remember who she talked to or when she made this call.  She also testified that she got the second opinion that she requested.

Plaintiff went to see Dr. Baughman on July 25, 2000.  She told him that she had been terminated because she was unable to do her work.  IBP paid for this visit.  Plaintiff did not like what Dr. Baughman recommended to improve the condition of her thumb.  Plaintiff received an impairment rating from Dr. Baughman on August 1, 2000.  Neither Ms. Soto nor Mr. Bolton were involved in decisions regarding whether plaintiff was entitled to benefits under the Kansas Workers' Compensation Act.

Plaintiff filed for unemployment, but did not tell the State of Kansas that she was terminated for filing a worker's compensation claim.  Instead, she said that she was fired because she was not doing what she was supposed to be doing.  A hearing before Administrative Law Judge Roth was held on December 13, 2001, where he approved a settlement.  Plaintiff then filed this lawsuit on July 12, 2002.

 Plaintiff testified that she believes Ms. Soto and a nurse in the Health Services Department named "Pam Castro" mistreated her because of a work-related injury.  Although plaintiff stated in her interrogatory answers that Mr. Bolton harassed, mistreated or overly scrutinized her work, she testified in her deposition that when she went to him to complain, he did not listen to her.  Plaintiff also testified that Mr. Bolton did not act with malice toward her.

Plaintiff claims that from March 23, 2000 to the end of her employment, Ms. Soto told her that she was not going to get her regular job back.  This either happened six times a month,

ten times, or a couple of times.  Plaintiff did not complain to anyone about this.  Plaintiff also

claims that from 1998 to the end of her employment, Ms. Soto told her three times a week that

she needed to go back to her regular job, but plaintiff did not tell anyone in management above

Ms. Soto that this was occurring.  Plaintiff told Teresa Hall about Ms. Soto's comments about

needing to go back to her regular job and Ms. Hall told plaintiff not to worry about it, she would

go back to her job when she was ready.

Plaintiff could not identify who took the rework job or if that person had less seniority

than she did.  Although plaintiff stated in her interrogatory answers that she had told Ms. Soto

that she was having "substantial physical difficulties" with her thumb, plaintiff admitted in her

deposition that she did not talk to Ms. Soto about having any problems with her thumb.  Plaintiff

testified that Ms. Soto stood in the doorway to the processing floor with her hands blocking it

and told plaintiff that she was not allowed to go in.  Plaintiff also testified that she did not know

when this occurred, did not take it seriously, and did not know why Ms. Soto did this.

Plaintiff testified that Ms. Soto told her and other workers that they could perform their

jobs better.  Plaintiff could not specifically identify any people that did not have work-related

injuries that Ms. Soto treated differently than plaintiff.  Plaintiff testified that she and her co-

workers, including some who had not filed worker's compensation claims, did not like Ms. Soto.

Plaintiff testified that she believes that Ms. Soto made up the allegation that plaintiff was not

doing her job on July 14, 2000, so that plaintiff would get fired.  Plaintiff also testified that she

believes Ms. Soto acted with malice toward her because she was trying to write her up and

because she stood in the doorway to the production floor.

Approximately fifty percent of the workers whom Ms. Soto supervises are on light or

restricted duty due to a work-related injury.  Ms. Soto testified that while employed by IBP, she

attended classes on being fair and learned that she needed to take everyone's injury into

consideration and try and help them.  Ms. Soto testified that it is her job to follow team

members' medical restrictions and find a job for team members to do and that she tries to "do the

right thing with the team member so that they can go back to work to their regular job."  She also

testified that on several occasions, when she talked to plaintiff about improving her job

performance, plaintiff was "very verbal and [said] I don't need to work here."

Ms. Soto testified that, based on her conduct, she believes that plaintiff thought that Ms.

Soto did not have a right to talk to her about her job.  She also testified that she believes plaintiff

was a consistently angry person at work.  Ms. Soto testified that she overlooked some of

plaintiff's poor work performance to avoid a confrontation with plaintiff, and that her decision to

counsel plaintiff about her poor performance on July 14, 2000, had nothing to do with her work-

related injury.

Plaintiff testified that "Pam Castro" in Health Services mistreated her by not knowing

that her thumb was broken and by accepting the doctor's release to work for plaintiff after

plaintiff told her that her thumb was "not normal."  Plaintiff testified that she asked Pam Castro

if she could see another doctor, but could not remember when.  Someone from the Health

Services Department contacted plaintiff after each of her work-related injuries and asked her if

she was having pain or discomfort.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[7]  A fact is only material under this standard if a dispute over it would affect the outcome of the suit.[8]  An issue is only genuine if it "is such that a reasonable jury could return a verdict for the nonmoving party."[9]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[10]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[11]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[12]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[13]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[14]  When examining the underlying facts of the case, the Court is cognizant that all inferences must be viewed in the light most favorable to the nonmoving party and that it may not make credibility determinations or

---

[7]Fed. R. Civ. P. 56(c).

[8]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[9]*Id.*

[10]*Id.* at 251–52.

[11]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[12]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325)).

[13]*Id.*

[14]*Id.*

weigh the evidence.[15]

## III.   Discussion

The plaintiff's burden in opposing a motion for summary judgment on her worker's compensation retaliation claim is to prove she was terminated "based on, because of, motivated by or due to" the defendant's intent to retaliate.[16]   The plaintiff need not prove this retaliatory intent with direct evidence nor establish that it was the only reason behind her discharge.[17]   The plaintiff, however, has the burden of proving her claim by a preponderance of the evidence that is "clear and convincing in nature."[18]   Evidence is "clear" when "certain, unambiguous, and plain to the understanding."[19]   Evidence is "convincing" when "reasonable and persuasive enough to cause the trier of fact to believe it."[20]

Not unlike employment discrimination cases, retaliatory discharge cases typically rely on circumstantial evidence, not direct evidence, to prove the employer's unlawful intent for discharging an employee.[21]   Consequently, "Kansas appellate courts have adopted the burden-shifting analysis of discrimination and free speech cases for use in workers compensation

---

[15]*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[16]*Foster v. Allied Signal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (internal quotations and citations omitted).

[17]*Id.*

[18]*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (citing *Ortega v. IBP, Inc.*, 874 P.2d 1188 (Kan. 1994)).

[19]*Id.*

[20]*Id.*

[21]*Foster*, 293 F.3d at 1192.

discharge cases."[22]  To establish a prima facie case of retaliation, a plaintiff must show that (1) she sustained an injury for which she could assert a future claim for benefits or filed a claim for worker's compensation benefits; (2) the employer had knowledge of plaintiff's compensation claim, or the fact that she had sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination.[23]  Upon such a showing, the burden shifts to the employer to articulate a legitimate, nonretaliatory reason for terminating the employee.

Once the employer discharges this obligation, the plaintiff must continue with the burden of proving by a preponderance of the evidence that the reasons offered by the employer were merely a pretext for wrongful termination.[24]  To avoid summary judgment, the plaintiff must come forward with "'specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge.'"[25]  "Although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."[26]  "Temporal proximity is sufficient to establish the causal connection

---

[22]*Gonzalez-Centeno v. N. Cent. Kansas Reg'l Juvenile Det. Facility*, 101 P.3d 1170 (Kan. 2004) (citing *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 35 P.3d 892 (2001)).

[23]*Foster*, 293 F.3d at 1193.

[24]*Id.* at 1194.

[25]*Id.* (quoting *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)).

[26]*Id.* (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (internal quotation and citations omitted)).

element of a prima facie case, but is not sufficient—standing alone—to raise a genuine issue of pretext."[27]

### A.    Prima Facie Case

Plaintiff's retaliation claim is based upon an alleged termination of her employment by IBP.[28]  IBP asserts that plaintiff cannot establish a prima facie case of retaliatory discharge because there is no evidence that plaintiff was terminated or that her separation from employment was caused by her exercise of worker's compensation rights.

### *Termination*

The record is less than clear on plaintiff's claim that she was terminated.  Mr. Bolton testified that plaintiff asked him to fire her on July 14, 2000.  Plaintiff testified that Mr. Bolton did not terminate her on July 14, 2000, but instead suspended her indefinitely.  Plaintiff claims that when she returned to the plant on July 15 and asked Mr. Bolton to return to work he said, "I don't think so" and asked her "to leave."  Mr. Bolton disputes that he met with plaintiff on July 15.  Then, when plaintiff returned to the plant on July 17, she met with Mr. Bolton and filled out a vacation request and was able to remain employed until August 8 so that she could earn three weeks of vacation, for which she was then paid.  Plaintiff did not work during the period of July 14 through August 8, 2000.  It is uncontroverted that a person must be an employee of IBP in order to request and receive payment for accrued vacation.  Plaintiff's version of events, even construed in a favorable light, does not establish a termination of employment on July 14 or 15. Instead, the record indicates that her employment ended on August 8, as a result of a deal she

---

[27] *Hysten v. Burlington N. Santa Fe Ry. Co.*, 372 F. Supp. 2d 1246, 1254-55 (D. Kan. 2005) (citing in part *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1241 (10th Cir. 2004)).

[28] (Pretrial Order ¶ 6(a)(1).)

struck with Mr. Bolton that enabled her to remain on the payroll in order to accrue vacation time. Given the state of the record, the Court questions whether plaintiff has produced sufficient evidence to raise a material issue of fact regarding the circumstances of her termination and whether it was voluntary or not.[29]

### Causal Connection

To establish a causal connection, a plaintiff must establish that "the individual or individuals who actually undertook the alleged retaliatory acts were aware or should have been aware of plaintiff's participation in the protected activity."[30]  A causal connection may be demonstrated by evidence such as protected conduct closely followed by adverse action.[31] Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation.[32]  "[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation.  By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation."[33]

---

[29]Plaintiff contends that termination and "adverse employment action" are used interchangeably.  Although her claim is for retaliatory discharge, plaintiff argues that this would include any adverse employment action short of termination.  Plaintiff asserts that the disciplinary action by Ms. Soto and the written warning and suspension by Mr. Bolton all constitute adverse employment actions.  While the Court agrees with plaintiff that such actions qualify as adverse, the Court does not agree that plaintiff can change and expand her theory of recovery to one of general retaliation when faced with summary judgment on her claim for retaliatory discharge.  *See Presta Oil, Inc. v. Van Waters & Rogers Corp.*, 276 F. Supp. 2d 1128, 1137 (D. Kan. 2003) (holding that plaintiff could not change the character of its claim in its brief challenging defendant's motion for summary judgment).

[30]*Foster*, 293 F.2d at 1193 (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998) (holding that a retaliatory discharge claim must be predicated on intentional and knowing retaliation).

[31]*Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997).

[32]*O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (citing *Conner*, 121 F.3d at 343).

[33]*Id.* (citing *Anderson v. Coors Brewing co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

In this case, plaintiff injured her thumb on March 23, 2000, and was allegedly terminated on July 15 or 17, 2000, a span of approximately four months.  Mr. Bolton testified that at the time of plaintiff's suspension on July 14, 2000, he was aware of her work-related injury, establishing a relatively weak temporal proximity.  He also testified that his suspension of plaintiff had nothing to do with her work-related injury or the fact that she was receiving medical treatment.  Plaintiff counters that the timing of her termination is sufficiently close in time to her injury and requests for medical leave, and is thus demonstrative of a causal connection.

By way of additional evidence, plaintiff alleges mistreatment by Ms. Soto and "Pam Castro," which she contends was motivated by her work-related injury.  Plaintiff does not offer any evidence that such mistreatment was somehow connected to Mr. Bolton suspending or terminating her.  There is no evidence that Ms. Soto or Pam Castro talked to Mr. Bolton about plaintiff's work-related injury before the suspension or alleged termination.  In fact, plaintiff admits that she failed to inform Ms. Soto that she was having problems with her thumb.  There is no evidence that Ms. Soto could have anticipated that her attempt to counsel plaintiff about her performance on the picking line, the lowest form of discipline possible under defendant's policies, would have started the chain of events that allegedly resulted in plaintiff's suspension and alleged termination.[34]

The Court notes that there are shortcomings in the quality of plaintiff's proof and

---

[34] Plaintiff also attempts to offer evidence about comments to her physician and the Kansas Department of Human Resources after she left the company.  In addition to questioning the relevance of these statements, the Court notes that plaintiff's assertions are made as argument in her brief in opposition to summary judgment; as previously discussed, she failed to present any additional factual contentions in separately numbered paragraphs as required by D. Kan. Rule 56.1.

arguments that suggest sufficient doubt about the plaintiff's ability to prove a prima facie case with respect to both termination and causation.  Nonetheless, the Court is mindful of the established principle that a "prima facie case is not an onerous burden."[35]  The Court thus concludes that plaintiff has established a prima facie case of retaliatory discharge, and will focus its ruling on plaintiff's lack of sufficient proof of pretext.

### B.    Pretext

The burden shifts to the defendant employer to show an articulate, non-retaliatory reason for the plaintiff employee's discharge.  Defendant IBP has done so by offering that plaintiff was called into the production office on July 14, 2000 because she did not perform her job correctly.  Plaintiff's attitude about the need to come to the production office led to her being taken to the personnel office.  There, plaintiff was insubordinate and was suspended indefinitely, with the opportunity to return the next day.  IBP's suspension (or termination) of plaintiff under the circumstances raises a triable issue as to its legitimate, non-retaliatory reason for discharge.

To avoid summary judgment after an employer has offered a legitimate reason for termination, "the employee must assert specific facts establishing a triable issue as to whether the employer's reason for discharge is mere cover-up or pretext for retaliatory discharge."[36]  "Although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether

---

[35]*Rebarchek v. Farmers Co-op Elevator*, 35 P.2d 892 (Kan. 2001).

[36]*Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002) (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994)).

the defendant's explanation is pretextual.'"[37]  To demonstrate pretext, a plaintiff should show more than "mere conjecture" that her employer's reason for termination  is insufficient.[38]  Plaintiff must show that the employer's stated reason for termination "was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief."[39]  The Tenth Circuit has held that a plaintiff in federal court who opposes summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer.[40]  Clear and convincing evidence does not require quantity, but requires that the quality of evidence is clear enough to make the trier of fact believe it.[41]

A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that defendant's stated reason for the termination was false, i.e. unworthy of belief; (2) with evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) with evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting

---

[37]*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000) (internal citation omitted and ellipses in original) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)).

[38]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

[39]*Miller v. Auto. Club of New Mexico, Inc.*, 420 F.3d 1098, 1124 (10th Cir. 2005) (quotation omitted).

[40]*Foster v. AlliedSignal Inc.*, 293 F.3d 1187, 1194-95 (10th Cir. 2002).  Kansas courts will not apply the clear and convincing standard at the summary judgment stage in an action for retaliation in the state's own courts. *Id*.

[41]*Ortega v. IBP, Inc.*, 874 P.2d 1188, 1198(Kan. 1994).

plaintiff.[42]

Based on plaintiff's tenuous evidence of a prima facie case and her failure to come forward with evidence from which a reasonable jury could infer a retaliatory intent from the quality and quantity of evidence required under Kansas law, the Court will grant summary judgment to IBP on this ground.  Plaintiff does not counter IBP's showing with additional evidence to prove its stated rationale for the discharge was pretextual.  There is simply no evidence before the Court suggesting that IBP suspended or terminated plaintiff because she filed a worker's compensation claim.  Although plaintiff suffered a work-related injury on March 23, 2000, she was not suspended until July 14 or terminated until August 8, 2000, over four months after she returned from her work-related injury absence.  It is undisputed that her three week absence in June 2000 was unrelated to her injury.

Moreover, plaintiff has not come forward with evidence to refute IBP's stated reason for suspension—insubordination.  Although she disagrees with Ms. Soto's assessment of her work performance on July 14, she does not controvert defendant's version of events and her behavior leading up to Mr. Bolton's suspension.  Plaintiff's belief that her assignment to the picking belt instead of her rework job is evidence that Ms. Soto wanted "to get rid of her," is nothing but speculation.  Ms. Hall, not Ms. Soto, assigned plaintiff to the picking belt because it was understaffed; even Ms. Soto had to work the picking belt on occasion.  Plaintiff had been taken off the rework job at various times both before and after her March 23, 2000 work-related injury.  When asked why she believed Ms. Soto retaliated against employees with work-related injuries, plaintiff could not identify any facts, events or occurrences that caused her to feel that way.

---

[42]*Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1195 (D. Kan. 2006) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

Plaintiff testified that many of her co-workers, including some who had not experienced work-related injuries, did not like Ms. Soto or the way she managed things.

Several of plaintiff's allegations further belie her claim of pretext.  It is undisputed that plaintiff was allowed to get a second opinion on her injury on July 17, 2000.  Although plaintiff had taken pay in lieu of vacation in June 2000, and did not have any vacation time remaining, IBP permitted her to take a leave of absence so that she could take time off to coincide with her husband's vacation.  And, Mr. Bolton worked with plaintiff so that she could get paid for three weeks of vacation that accrued on August 8, 2000.

Plaintiff has not met her burden to show a triable issue of fact as to whether defendant's actions were pretextual.  Summary judgment is proper with respect to this claim.[43]

**IT IS THEREFORE ORDERED BY THE COURT** that defendant IBP's motion for summary judgment [Doc. 82] is GRANTED.

IT IS SO ORDERED.

Dated this 21st day of February 2007.

 S/ Julie A. Robinson
Julie A. Robinson
United States District Judge

---

[43]Because the Court grants summary judgment on plaintiff's retaliatory discharge claim, it need not address on remand the issue of whether that claim was barred by the prior settlement agreement.